NOT DESIGNATED FOR PUBLICATION

No. 115,258

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KEVIN D. EVANS,
*Appellee*,

v.

CESSNA AIRCRAFT CO.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed April 7, 2017. Affirmed.

*Vincent A. Burnett* and *Travis L. Cook*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, for appellant.

*Jeff K. Cooper*, of Topeka, for appellee.

Before GREEN, P.J., STANDRIDGE and GARDNER, JJ.

*Per Curiam*:  Cessna Aircraft Co. appeals an order entered by the Workers Compensation Board, challenging the functional impairment ratings for its employee, Kevin D. Evans. Evans cross-appeals the Board's finding which limited Cessna's liability to $500 for the costs of surgery Evans obtained independently from the workers compensation proceeding. Finding no reversible error, we affirm.

*Factual and procedural history*

Evans has worked for Cessna for about 20 years and currently works in the production shop, overseeing repairs to aircraft. In October 2011, he was injured when he fell to the floor after the stool he was sitting on collapsed. He struck the floor with his middle to lower back, buttocks, and elbows. He visited Cessna's employee health services department and was referred to physicians for treatment of his back and shoulder injuries.

For the shoulder injury, Cessna referred Evans to Dr. Daniel J. Prohaska, who prescribed anti-inflammatory medication, physical therapy, a subacromial injection, and, finally, arthroscopic surgery on Evans' left shoulder. When those measures failed to eliminate his pain, Dr. Prohaska concluded that Evans had reached maximum medical improvement and assigned a 2% impairment to each of the left and right upper extremities, which converts to a 2% impairment to the body as a whole under the American Medical Association Guides to the Evaluation of Permanent Impairment, (4th ed. 1995) (AMA), as required by K.S.A. 2016 Supp. 44-510e(a)(2)(B).

For the injury to the lumbar spine, Cessna referred Evans to Dr. John P. Estivo. Dr. Estivo ordered physical therapy, pain medication, and a series of epidural injections to relieve "nerve root irritation." After Evans reported no relief from the injections, Dr. Estivo diagnosed lumbar radiculopathy and ordered tests to confirm the diagnosis. He removed his diagnosis when the CT myelogram and NCS/EMG showed no objective evidence of radiculopathy. He did not recommend surgery because the tests did not reveal any herniated discs or nerve root impingement. Having no other treatments available, Dr. Estivo placed Evans at maximum medical improvement in March 2012 and released him from care. He assigned a 5% whole body impairment.

Still in pain, Evans sought treatment from his personal physician, who referred him to Dr. John R. Dickerson, a surgeon. Dr. Dickerson saw him in August 2012 and

recorded leg pain consistent with radiculopathy and recommended surgery. In an effort to resolve the conflicting opinions of Dr. Dickerson and the treating physician, Dr. Estivo, the administrative law judge (ALJ) ordered an independent medical exam (IME) by Dr. Paul S. Stein in August 2013. In his report in October 2013, Dr. Stein agreed with Dr. Dickerson's surgical recommendation to some extent but later stated he could not recommend surgery after a discogram test did not conclusively show that Evans had nerve root impingement at the L5-S1 level causing radiculopathy. The ALJ and the Board ultimately found a 10% functional whole person impairment to the lumbar spine.

About a year later, Evans returned to Dr. Dickerson, who performed spinal surgery to relieve Evans' pain, under Evans' health insurance. Evans did not notify the court or seek authorization. Cessna's attorney first learned that Evans had undergone surgery when Evans appeared at the regular hearing in November 2014, 4 months after the surgery. Evans sought reimbursement through his workers compensation case, and Evans reported his leg pain was 70% better than before surgery.

Based partly on that post-surgical improvement, the ALJ found the surgery was reasonably and medically necessary to cure Evans' left leg pain. Accordingly, he assessed the costs of surgery against Cessna. He assigned a 17% whole body impairment rating based on Evans' injuries to his shoulders and lower back but found Evans failed to prove injuries to his cervical or thoracic spine. The Board reversed the award of surgical fees but affirmed the ALJ's impairment findings.

*Our standard of review is not de novo*

Our review of the Board's action is governed by the Kansas Judicial Review Act (KJRA). K.S.A. 2016 Supp. 77-621. We may grant relief if "[t]he agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the

3

record as a whole." K.S.A. 2016 Supp. 77-621(c)(7). "'[I]n light of the record as a whole'" includes relevant evidence cited by the parties that either supports or detracts from the Board's findings of fact. K.S.A. 2016 Supp. 77-621(d).

This statute requires us to (1) review evidence both supporting and contradicting the Board majority's findings; (2) examine the majority's credibility determination, if any; and (3) review the majority's explanation as to why the evidence supports its findings. See *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). We cannot reweigh the evidence or engage in de novo review of the Board's factual findings. K.S.A 2016 Supp. 77-621(d). We explained the balance between "de novo review" and the section 77-621(d) requirement to examine evidence that detracts from the Board's ruling in *Herrera-Gallegos v. H & H Delivery Service, Inc*., 42 Kan. App. 2d 360, 212 P.3d 239 (2009). We found we must determine whether "the evidence supporting the agency's decision has been so undermined by cross-examination or other evidence that it is insufficient to support the agency's conclusion." 42 Kan. App. 2d at 363. We apply that standard here.

I. *Does substantial competent evidence support the Board's impairment ratings?*

The ALJ based his award of 17% whole body impairment on evidence from the preliminary hearing and the depositions of six physicians:  Dr. Prohaska, who treated the shoulder injury; Dr. Estivo, who treated the lumbar spine injury; Dr. Chris D. Fevurly, hired by Cessna to provide an IME; Dr. Pedro A. Murati, hired by Evans to provide an IME; Dr. Stein, appointed by the court to provide an IME; and Dr. Dickerson, who performed Evans' surgery.

4

(A) *The Claimed Cervical-Thoracic Injury*

The ALJ excluded the cervical-thoracic injury from the award because he found that "the balance of the evidence in this cases does not support an injury to that area of the body as a result of this accident." The Board affirmed, finding that Evans failed to prove injury.

As claimant, Evans has the burden to prove the condition for which he seeks an award. Evans' burden is "a preponderance of the credible evidence that such a party's position on an issue is more probably true than not true on the basis of the whole record." K.S.A. 2016 Supp. 44-508(h).

Dr. Murati was the only physician who noted complaints of neck pain and the only one who assigned impairment ratings for it. He assigned 15% whole person impairment for neck pain and 5% whole person impairment for myofascial pain syndrome affecting the thoracic paraspinals. In contrast, the treating physician, Dr. Estivo, noted a normal examination of the cervical spine and full range of motion in the neck in December 2011 and in February and March 2012.

Evans asserts that Dr. Fevurly found deficits in his cervical range of motion when examining him as part of an IME requested by Cessna. Actually, Dr. Fevurly's report stated that Evans had "near normal range of motion" and "there was no evidence for a neck injury or cervical radiculopathy." Further, he stated that the neck pain was not mentioned until the last medical report he reviewed, which was Dr. Murati's report.

Evans argues that the other doctors did not make findings about a neck injury because they were asked to evaluate only the shoulders and lumbar spine. But the record refutes that assertion. Some of the exams included evaluations of Evans' neck and, importantly, there is no evidence of Evans complaining about neck pain to any physician

5

other than Dr. Murati. Further, at the regular hearing before the ALJ in November 2014, Evans testified that he has pain in his mid-back and neck and thinks it "came over time" instead of from the fall at Cessna.

The Board weighed the testimony and reports before it and found Dr. Murati's testimony insufficient to prove injury to the cervical or thoracic spine. Having reviewed the record as a whole, we find substantial evidence supporting that finding.

(B) *The Shoulder Injury*

We next examine the shoulder injury. The ALJ arrived at a whole body impairment of 8% from the shoulder injury by giving equal weight to Dr. Murati's rating of 14% and Dr. Prohaska's and Dr. Fevurly's 2% ratings. The Board agreed with the ALJ's findings but noted "conflicting ratings" existed.

Each doctor rated for loss of range of motion (ROM), but Dr. Murati also rated for a second type of impairment in the left shoulder. We first examine the conflicting testimony regarding ROM and then discuss the rating given by Dr. Murati.

*ROM ratings*

Cessna attacks the credibility of Dr. Murati's ROM rating, and Evans attacks the credibility of Dr. Fevurly, based on his apparent lack of respect for the judicial process. When asked if he would like to see the order where a judge disqualified him for not being impartial, Dr. Fevurly responded, "What does that Judge know."

Three doctors tested Evans' ROM. Dr. Murati found the greatest loss of ROM. The table below shows the results reported by the doctors. According to Dr. Prohaska, a 1%

difference in ROM equates to a 10-degree variation in result. Thus, the maximum difference of 30 degrees equates to a 3% difference in the measurement.

| Examining Physician | Date of Exam | Degrees of Forward Flexion R/L | Degrees of Abduction R/L |
|---|---|---|---|
| Dr. Prohaska | July 2012<br>Later visits | 175/175<br>/165 | 175/165<br>/165 |
| Dr. Murati | December 2013 | 145/150 | 145/150 |
| Dr. Fevurly | December 2014 | 180/180 | 180/180 |

We find that the ROM results do vary, but not significantly. Given that the exams were about a year apart, and that Dr. Prohaska noted Evans' range of motion was reduced at his "later visits," the variance in the doctors' measurements does not undermine the sufficiency of that evidence.

*Dr. Murati's SPSD rating*

Cessna next challenges Dr. Murati's ratings. Dr. Murati assigned the following ratings for the shoulder injuries:

Left:   ROM  =  8 % upper extremity impairment

SPSD =  10% upper extremity impairment

Total  =  10 % whole body impairment

Right:  ROM =  7% upper extremity impairment

Total =  4 % whole body impairment

Both shoulders total:  14% whole body impairment.

7

Dr. Murati assigned a 10% left upper extremity impairment for a condition he identified as left shoulder "status post subacromial decompression" (SPSD). Dr. Murati was the only physician to rate this, but the ALJ did not question the credibility of Dr. Murati's finding of SPSD. Treatments provided by Dr. Prohaska may or may not have been related to that condition. Dr. Prohaska diagnosed bilateral shoulder injury and coracoid traumatic impingement, then performed a "coracoid decompression" surgical procedure on Evans and treated Evans with a "subacromial injection."

Conversely, Dr. Prohaska assigned 2% upper extremity impairment for each shoulder for loss of ROM, equating to 2% whole body impairment. Dr. Fevurly also rated 2% impairment per shoulder because of the pain, explaining that he was "getting soft in [his] old age."

The ALJ Board's whole body impairment of 8% from the shoulder injury reflects the middle ground between Dr. Murati's rating of 14% and Dr. Prohaska's and Dr. Fevurly's ratings of 2%. Given the record as a whole, we find sufficient evidence to support the Board's findings. To rule otherwise, we would have to reweigh the evidence.

(C) *The Lumbar Spine Injury/Radiculopathy*

The ALJ summarized the testimony of five physicians and found that "the only credible rating is Dr. Murati's [because it] is clear from the very beginning of the case, claimant had evidence of radiculopathy." The ALJ found that "the results of that surgery [by Dr. Dickerson] speak for themselves," implying that the success of the surgery in relieving Evans' pain indicated that Evans did have radiculopathy prior to the surgery. Thus, in accordance with the AMA, the ALJ found a 10% whole body impairment from the lumbar spine injury.

8

The Board adopted the 10% rating, as opposed to the 5% rating assigned by the other physicians. The difference in the impairment ratings is because Dr. Murati placed the injury in Lumbosacral DRE Category III of the AMA, whereas the others placed it in Category II. Category II, Minor Impairment, refers to injuries where the patient complains of radicular pain but there is "*no* objective sign of radiculopathy." Category III, Radiculopathy, requires the patient to have "significant signs of radiculopathy, such as loss of relevant reflex(es) or measured unilateral atrophy . . . . The impairment may be verified by electrodiagnostic findings." The two primary types of electrodiagnostic tests are electromyography (EMG) and nerve conduction studies (NCS). Both were performed on Evans.

A narrow grey area exists between "*no* objective evidence" and some undefined level of objective evidence that raises the level to "significant signs of radiculopathy." The emphasized "*no*" in the AMA suggests that even a small amount of credible objective evidence of radiculopathy, coupled with significant subjective symptoms, would support rating an injury as Category III.

The record is replete with Evans' subjective reports of radiculopathy, so his condition clearly met the Category II standards, as the parties agree. Evans argues that a claimant's own testimony is sufficient to prove his condition, citing *Hanson v. Logan U.S.D. 326*, 28 Kan. App. 2d 92, 95, 11 P.3d 1184 (2000). By definition, Category II applies where the patient complains of radicular pain but there is "*no* objective sign of radiculopathy." But, as noted above, Category III requires some objective evidence and therefore cannot be proven solely by Evans' testimony.

The seeming conflict between the medical records stating Evans had radiculopathy and the results of diagnostic testing was explained by Dr. Stein, the physician appointed by the court to provide an IME. He stated there is distinction between typical medical usage of the term radiculopathy and the legal meaning of the term. He indicated that a

9

physician referring to pain as radiculopathy does not mean that a patient has radiculopathy as required by the AMA. He testified that a person having a normal EMG result could actually have "some impingement on a nerve root and extremity pain" but the "nerve root has not been damaged yet to the point that it shows up. On the other hand, if you are doing a legal situation, the 4th Edition of the AMA requires some findings of nerve root damage before it will raise the individual to the level of radiculopathy."

The objective evidence in this case consists of the initial MRI, a CT/myelogram, a discogram, and clinical observations. We discuss these below.

*The initial MRI and CT/myelogram*

Based on the initial MRI in 2011 and Evans' symptoms, Dr. Estivo diagnosed radiculopathy. Dr. John Jensen, the physician who administered epidural injections on Dr. Estivo's order, recorded that his own "diagnostic impression" was radiculopathy. Thus the doctors agreed that the initial MRI showed signs supporting radiculopathy.

The interpretations of the CT/myelogram were not so uniform. Drs. Dickerson and Stein interpreted the CT/myelogram to show possible nerve root compression. Dr. Stein stated that he agreed with Dr. Dickerson that "there is some suggestion on the post myelogram CT scan of abnormality at the left L5-S1. This might simply be a poor diffusion of contrast into the left S1 nerve root or there could be some nerve root compression."

Dr. Estivo, however, said the CT/myelogram showed no compression existed. In fact, he removed his diagnosis of radiculopathy after the CT/myelogram and NCS/EMG showed no objective evidence of nerve root impingement. Therefore, he placed the injury in Category II and assigned a 5% whole body impairment for the lumbar spine.

10

Dr. Dickerson read the CT/myelogram and stated, "[o]n further inspection, he does have actual compression of the exiting S1 nerve root on the left." Cessna argues that the Board erred in considering Dr. Dickerson's opinion, citing three reasons why it did not constitute "competent medical evidence" as required by K.S.A. 2016 Supp. 44-510e(a)(2)(C). Cessna first argues that Dr. Dickerson's opinion is not competent evidence because his 2012 and 2014 examinations differ considerably. But we are not persuaded, as a person's medical condition can progress over the course of 2 years. Second, Cessna argues that Dr. Dickerson did not have Evans' prior medical records. But this does not cause us to discount Dr. Dickerson's own reports from 2012 and 2014. Third, Cessna argues that Dr. Dickerson's recommendation of surgery was incompetent because he relied on the discogram results. But we are not examining whether surgery was the right remedy; instead, we are examining only whether objective evidence of radiculopathy supports a rating of 10%. We credit Dr. Dickerson's testimony as to the latter.

*Discogram*

The final diagnostic test was a discogram performed at Dr. Stein's suggestion. It showed that Evans had pain at the L5-S1 level as well as at two other levels. Although the validity of discograms as a basis for making a surgical recommendation was severely undercut, we consider the discogram to be some objective evidence of radiculopathy because the physicians did not attack the fact that the discogram revealed Evans had pain "similar to the patient's initial pain," albeit at two additional disc locations.

*Clinical observations*

Direct physical examination may be another type of objective evidence. Dr. Stein did not find any evidence in his examination of Evans that would "document radiculopathy at the level required by the AMA Guides." On examination about a year later, Dr. Dickerson found that the "left ankle jerk reflex" was decreased, yet also found

11

the reflexes were normal bilaterally. The straight leg raise test for radiculopathy was negative for both the right and the left leg. Dr. Dickerson thus noted his clinical observation of radiculopathy by finding slightly decreased reflexes in the left heel.

Although the record contains some countervailing evidence to support an award for 5% whole body impairment under Category II, we do not find the agency's decision has been so undermined that it is insufficient to support the agency's conclusion. Accordingly, we affirm the finding of a 10% whole body impairment under Category III.

No basis for reversal of the Board's impairment findings for Evans' neck, shoulder, or spine injuries has been shown.

II. *Did the board err in limiting Cessna's liability for costs of surgery to $500?*

Evans' cross-appeal argues that the Board erred in limiting Cessna's liability for the costs of surgery on his back to $500, pursuant to K.S.A. 2016 Supp. 44-510h(b)(1). The Board ruled that "even though the medical treatment may have been reasonable and necessary, and somewhat successful in relieving some of the claimant's symptoms, the failure by claimant to obtain authorization is fatal to this issue."

We review the Board's interpretation and application of the law de novo, owing no deference to the Board's interpretation. *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013). "[T]he legislature is presumed to have expressed its intent through the language of the statutory scheme, and when a statute is plain and unambiguous, the court must give effect to the legislative intention as expressed in the statutory language." *Fernandez v. McDonald's*, 296 Kan. 472, 478, 292 P.3d 311 (2013). However, where the plain statutory language reveals an ambiguity, the court may apply canons of statutory construction, such as in pari materia—construing various provisions of the Workers Compensation Act to reconcile and bring them into a workable harmony

12

where possible. 296 Kan. at 479 (citing *Redd v. Kansas Truck Center*, 291 Kan. 176, 195, 239 P.3d 66 [2010]).

Evans argues that Cessna is liable for the cost of the unauthorized treatment because it unreasonably refused to provide him adequate care. Evans primarily relies on two statutes. The first states the general duty of the employer to "provide . . . such medical, surgical, and hospital treatment . . . as may be reasonably necessary to cure and relieve the employee from the effects of the injury." K.S.A. 2016 Supp. 44-510h(a). Evans argues that Cessna failed to meet its duty and, thus, he was authorized by K.S.A. 2016 Supp. 44-510j(h) to obtain medical treatment on his own and hold Cessna liable for the cost. That statute provides that "[i]f the employer has knowledge of the injury and refuses or neglects to reasonably provide the services . . . required by this act, the employee may provide the same for such employee, and the employer shall be liable for such expenses." K.S.A. 2016 Supp. 44-510j(h). The terms of that statute were met in *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 621-22, 256 P.3d 828 (2011),where the employer possessed knowledge of the employee's work-related injury but provided no medical care.

Cessna argues that it does not fall under K.S.A. 2016 Supp. 44-510j(h) because it provided reasonable medical care, distinguishing it from *Saylor*. It argues that K.S.A. 2016 Supp. 44-510h(b)(2) applies, limiting its liability for unauthorized medical care to $500. We agree.

The record reflects that Cessna provided Evans with adequate health care. Cessna provided Evans with a physician after learning of his injury, and that physician, Dr. Estivo, treated him until he was at maximum medical improvement, then released him. Dr. Estivo, did not believe surgery was necessary. When Dr. Dickerson indicated otherwise, the court ordered an IME with Dr. Stein, who ultimately reached the same conclusion as Dr. Estivo—that Evans was not a surgical candidate and had reached

13

maximum medical improvement. Dr. Prohaska reached that same conclusion. But Evans never filed an application pursuant to K.S.A. 2016 Supp. 44-510h(b)(1) alleging any physician's treatment was unsatisfactory. Under that statute, "if the director finds, upon application of an injured employee, that the services of the health care provider furnished by the employer and rendered on behalf of the injured employee are not satisfactory, the director may authorize the appointment of some other health care provider." Instead, nearly 2 years after Dr. Estivo treated him and 1 year after Dr. Stein saw him, Evans unilaterally sought surgery on his back from Dr. Dickerson.

K.S.A. 2016 Supp. 44-510h(a) establishes an employer's general duty to provide medical care for an injured employee. Notably, the statute contains no provision requiring an employer or an employer's insurance carrier to pay for any medical expenses incurred solely at the employee's discretion. *Thompson v. Hasty Awards*, *Inc.*, No. 106,359, 2012 WL 1970241, at \*9 (Kan. App. 2012) (unpublished opinion). To the contrary, K.S.A. 2016 Supp. 44-510h(b)(2) states: "Without application or approval, an employee may consult a health care provider of the employee's choice for the purpose of examination, diagnosis or treatment, but the employer shall only be liable for the fees and charges of such health care provider up to a total amount of $500."

Evans does not contend that he was not required to obtain prior authorization from Cessna, or that he actually obtained such authorization. And "the Act clearly provides that when an employee does not obtain the appropriate authorization to use a particular health care provider, the maximum liability of the employer is $500." *Mohamed v. Tyson Fresh Meats, Inc.*, No. 112436, 2015 WL 4094333, at \*2 (Kan. App.) (unpublished opinion), *rev. denied* 303 Kan. 1078 (2015) (citing K.S.A. 2008 Supp. 44-510h[b][2]).

"When a workers compensation statute is plain and unambiguous, this court must give effect to its express language rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to

14

add something not readily found in it." *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2009).

Evans had an open workers compensation case in which to request a hearing for further evaluation or treatment, and he had ample opportunity to do so between Dr. Stein's IME in October 2013 and Dr. Dickerson's recommendation for surgery in June 2014. Yet another month passed between Dr. Dickerson's recommendation for surgery and the performance of the surgery in July 2014. Still, Evans made no attempt to obtain authorization prior to the surgery. As the Board found, under these circumstances, Evans' failure to avail himself of the statutory option to make a new application for authorization of the surgery precludes his recovery of more than $500.

We appreciate that Evans was experiencing pain and sought the treatment he believed was necessary and which did provide some relief, according to his testimony. However, he proceeded outside the clearly established rules for obtaining coverage under the Workers Compensation Act, so he cannot receive reimbursement for the unauthorized expenses.

Affirmed.